## VICTOR TALKING MACHINE CO. v. GEORGE.

No. 5169.

Circuit Court of Appeals, Third Circuit.

Jan. 3, 1934.

Rehearing Denied April 9, 1934.

Isaac D. Levy, of Philadelphia, Pa., I. E. Lambert and Robert P. Myers, both of New York City, Louis Levinson, of Philadelphia, Pa., and Louis B. LeDuc, of Camden, N. J., for appellant.

Robert L. Nase, of Flushing, N. Y., and M. J. Fulton, of Richmond, Va., for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge.

This is an appeal from a decree in a suit for damages in the District Court adjudging the plaintiff, David Graves George, to be the author of the song entitled, "Wreck of the Old 97," which the defendant recorded on one of its talking machine records.

On September 27, 1903, a Sunday train, No. 97, which ran over the Southern Railroad from Washington to Atlanta, was late at Lynchburg and in making up lost time, its engineer ran it at a high rate of speed on a steep grade down one side of White Oak Mountain, just north of Danville, Va. As the train reached a curving trestle, it left the tracks and plunged into a ravine below. The crew was killed and the train was completely destroyed.

Quite a number of songs were written by different persons to commemorate this sad event. The testimony shows that shortly after the accident one was written by Fred Lewey, another by Charlie Noell, and a third is alleged to have been written by the plaintiff, David Graves George. Afterwards others were written.

These songs, more or less alike, became very popular in and about Fries, Monroe, Lynchburg, Gretna, Lima, Danville, and Spencer, Va., and were sung to the music of instruments such as guitars and banjos at country gatherings, in plank taverns, and under electric lights on street corners on summer nights. They then mostly passed into disuse and were forgotten for many years, except at Fries, where they seem to have been kept alive largely through the singing and playing of Henry Whitter, an accomplished musician, who played a double accompaniment of the guitar and harmonica.

With the dramatic instinct of a real musician, Whitter shortened Noell's song and made it more "peppy" by changing a few words and quickening the time of the music of the song known as "The Ship That Never Returned," to which he sang it. He added the concluding stanza from the song of "The Parted Lovers." His rendition follows:

"They gave him up his order at Monroe, Virginia,
Saying Steve you're way behind time,
This is not 'Thirty-Eight' but it's 'Old Ninety-Seven,'
You must put her in Spencer on time.

2.

Steve Brooklyn said to his black greasy fireman,
Just shovel on a little more coal,
And when we cross the White Oak Mountain,
You can watch old ninety-seven roll.

3.

It's amighty rough road from Lynchburg to Danville,
And a line on a three mile grade,
It was on this grade when he lost his airbrakes
And you see what a jump he made.

4.

He was going down grade making ninety miles an hour
When his whistle began to scream,
He was found in the wreck with his hand on the throttle
And was scalded to death by steam.

5.

So come on you ladies you must take warning from this time, now and on,
Never speak harsh words to your true loving husband,
He may leave you and never return."

Some time prior to August, 1924, Vernon Dalhart of Marmoneck, N. Y., was recording for the Edison Talking Machine Company. He had never heard Whitter's song, but was given a record containing it. He listened to the record as it was played, copied the words as he understood them, and rendered the same for the Edison Company.

In August, 1924, he began to work for the defendant and rendered the song for it:

"They gave him his orders at Monroe, Virginia,
Saying, 'Pete, you're way behind time. This is not 38,
But it's old 97. You must put her in Center on time.'

He looked round then to his black, greasy fireman

'Just shove on in a little more coal, and
when we cross
That White Oak Mountain, you can watch
old 97 roll.'

It's a mighty rough road from Lynchburg
to Danville,
And a line on a three-mile grade.
It was on that grade that he lost his av-
erage
And you see what a jump he made.

He was going down grade making ninety
miles an hour
When his whistle broke into a scream.
He was found in the wreck with his hand
on the throttle,
And a-scalded to death with the steam.

Now ladies, you must take warning, from
this time now and on
Never speak harsh words to your true love
and husband,
He may leave you and never return."

After due and careful investigation to
ascertain if there were any rights of authors
to be protected, and finding none, the song
was recorded on one side of a record by the
defendant company and thereafter sold,
mostly through the South.

The plaintiff says that he composed and
wrote this song and brought this suit to re-
cover damages for the violation of his com-
mon-law rights in the song. The defendant
denies that George wrote it. The authorship
of the song, therefore, is the real question
in this case.

George says that he wrote and sang it
within a week or ten days after the wreck.
He relies upon his own testimony in open
court and the depositions of members of his
family and of several other witnesses to
prove his authorship.

It is established beyond doubt that Noell
and Lewey wrote the songs bearing their
names. Lewey was eighteen years old and
Noell was seventeen when the wreck occurred.
Lewey was living at the time at Danville,
Va., and was one of the first on the scene aft-
er the wreck. He was living with the grand-
mother of George R. Plott and William L.
Plott. In fact the Plott brothers and Lewey
roomed together.

The following is a copy of Noell's song:

"Come all of you fellows and gather around
me and a sad sad story to hear,
All about the wreck of Old Ninety Seven.
And the death of the brave engineer.

At the Washington Station that Bright
Sabbath morning, just at the rising of
sun.
He kissed his dear wife and says my chil-
dren God bless you. Your father must
go on his run.

Steve Brodie was the engineer and a brave,
brave man was he.
But a many poor man has lost his life for
the Railroad Company.

Ninety Seven was the fastest mail that was
ever on the Southern line,
All the freight trains and passengers took
the hold for Ninety Seven
For she was compelled to be at station on
time.

Ninety seven was the fastest train that was
ever on the Southern line
But when she pulled in at Monro Virginia,
she was Forty Seven minutes behind.

At Monro Virginia he received his orders,
saying Steve you are away behind
This is not Thirty Eight but its Ninety
seven. You must put her in to Danville
on time.

He climbed in his engine at Monro, Virginia,
saying fireman its do or die
I will reverse the lever throw the throttle
wide open and we will watch old Ninety
Seven fly.

Steve Brodie was the engineer on that fa-
tal Sunday eve,
And his fireman leaned far out at Lynch-
burg just waiting for the signal to leave.

When they gave him the board he pulled
open the throttle although his air brakes
was bad.
And the people all said when he passed
Franklin junction it seems like the en-
gineer was mad.

The conductor said to the engineer and fire-
man. Dont neglect that whistle or bell.
For we must put this train on time in to
Danville. Or we will drop her right in
to Hell.

Steve Brodie said to his faithful old fire-
man, Just throw in a little more coal.
And when I blow for the Henry Street
crossing. You just watch my drivers
roll.

Now its a awful bad road from Lynchburg
to Danville and from Lima its a four
mile grade.
It was on this grade that his air brakes
failed him. And look what a jump she
made.

Falling down this hill at seventy miles an hour his whistle began to scream

He was found in the wreck with his hand on the throttle he had scalded to death from the steam.

When the news come flashing over the telegraph wires. And this is the way it read.

That brave engineer that pulls ninety seven is lying in North Danville dead.

Did he ever pull in no he never pulled in at one forty five he was due

It was hours and hours dispatchers was waiting but that fast mail never come through.

Now she never pulled in no she never pulled in you could hear it in silent breath,

For his dear little wife fell back and fainted when the news came home of his death."

This song, written soon after the accident, was sent to the Mill News, a newspaper edited by a Mr. Escott and published by the Mill News Publishing Company of Charlotte, N. C.

Lewey's song was written within two or three months after the accident and was sung by him in Danville, Lynchburg, and Fries.

Robert W. Gordon, an eminent authority on this subject, made an exhaustive examination of all the songs written about this wreck. For twenty-five years he devoted himself to the study of American folk songs. For two and a half years he had charge of the Archives of American Folk Song in the Congressional Library at Washington, D. C. In 1923, he was editor of the department in the Adventure Magazine known as "Old Songs That Men Have Sung," and at the same time was Shelden fellow for Harvard University, collecting in the field. He sought to determine the authorship of these songs before any controversy about them arose and before this case was begun. During his investigation, he never heard of the plaintiff. But he learned of the authorship of Lewey, Noell, and others, and of the rendition of Whitter and Dalhart.

The following is the version of the song of the plaintiff, who says the defendant's record was copied from it.

"On a cold frosty morning in the month of September
When the clouds were hanging low
97 pulled out from the Washington station
Like an arrow shot from a bow.

They gave him his orders at Monroe, Va.
Saying Peat you are way behind time

It's not 38 but it's old 97
You must put her in Spencer on time.

He looked at his black greasy fireman
And said shovel in a little more coal
For when we cross that White Oak mountain
You can see old 97 roal.

It's a mighty rough road from Lynchburg to Danville
And Lima its a three mile grade
It was on this grade that he lost his average
And you see what a jump he made.

(Th)ey was going down grade making 90 miles an hour
Who when the whistle whistle whistle broke in to a scream
He was found in a reck with his han on the throttle And sca(l)ded to deth with the s——

Now ladies you must take warning
From this time on
Never speak harsh words to your true loving husbands
For they may leave you and never r——
Did she ever pull in no she never pulled in
For hours and hours ——— as watching
For the Train that never pulled (in?)"

The plaintiff's song and Dalhart's rendition of Noell's are so nearly alike that it is evident that one copied from the other.

The testimony establishes with reasonable certainty the authorship of the songs of Noell and Lewey and the rendition of Whitter and Dalhart.

Did Dalhart copy his song from any song composed and written by the plaintiff?

Before we attempt to answer this question, it will be well to explain how it arose. On March 1, 1927, the following statement was published in the Richmond News Leader of Richmond, Va.: "The Wreck of the old 97. When did the wreck of Old 97 happen and how many were killed? If we could locate an answer to this question we could win enough money to retire in business."

The editor's response appeared in the paper the next day: "The News Leader is advised that the disaster which has been styled 'The Wreck of the Old 97' occurred in September, 1903, when all the passengers were killed except one boy. The song called 'The Wreck of the Old 97' is one whose authorship is unknown. Offers of money by the Victor Company, as royalty on the record, are said to have met with no takers."

The plaintiff evidently saw these items in the News Leader and immediately went over to his neighbors and heard a record containing the song played. On March 4, 1927, two days after the second item had appeared in the paper, he wrote a letter to the News Leader, in which, among other things, he said: "I with others composed the poetry of 97." This letter with some slight corrections in grammar and spelling was printed by the paper on March 7, 1927. Some time thereafter the plaintiff called at the office of the News Leader and asked for the return or loan of the letter. He never returned it, and, when it was demanded at the trial, the words "with others" had been erased and the word "alone" substituted for them, so that the sentence then read, "I alone, (instead of 'with others') composed the poetry of 97." The plaintiff admitted that the word "alone" was in his handwriting. His explanation of why he had secured the letter from the office of the News Leader and made the change is disingenuous.

George, soon after the notices came out in the newspaper, opened negotiations with the defendant company and sought to secure damages for the use of the song by it. The defendant refused to pay, and this suit followed.

If the plaintiff wrote the song in question, he is entitled to damages. The question is whether or not he wrote it.

█ Counsel, in an unusually able argument based upon a clear and searching analysis of the evidence, has convinced us that the plaintiff did not write the song used on the defendant's record, but that he copied it largely from Dalhart's rendition of Whitter's record. This conclusion depends not so much upon the veracity of witnesses as upon documentary evidence.

However, the plaintiff says that he, not only wrote this song, but that he did so without any thought of music or melody in mind, and when it was finished the words exactly fit the music of "The Ship That Never Returned," so that without change they could be sung to that music "syllable-for-note." This strikes us as impossible for a person of his experience and training to do.

Not one of all the songs written on the theme of this accident before Dalhart's rendition called the engineer on the ill-fated train "Pete." Every one called him "Steve." Dalhart, however, called him "Pete," because, he says, he did not clearly understand Whitter's record when it was played for him. The plaintiff likewise called him "Peat," misspelling the name.

The first two lines of the first stanza of Whitter's song are:
"They gave him up his order at Monroe, Virginia,
Saying Steve you're way behind time."

The first two lines of the first stanza of Dalhart's song read as follows:
"They gave him his orders at Monroe, Virginia,
Saying, 'Pete, you're way behind time. This is not 38.'"

The following are the first two lines of the second stanza of George's song:
"They gave him his orders at Monroe, Va.
Saying Peat you are way behind time."

In the various songs such adjectives are used to describe the fireman as "faithful old fireman," "black dirty fireman," "brave young fireman," "brave little fireman," "brave old fireman." Whitter was the first to refer to him as "black, greasy fireman." Dalhart following Whitter also calls him "black greasy fireman," and the plaintiff likewise says "black greasy fireman."

It is significant that none of the old songs refer to him as "black greasy fireman," and that Whitter and Dalhart are followed by the plaintiff in thus describing him.

In the third stanza of Dalhart's song he says: "It's a mighty rough road from Lynchburg to Danville." The plaintiff says the same thing, "mighty rough road," in the first line of his fourth stanza.

In all the texts claiming to be old, the adjective "bad" is used to describe "road." For example, Lewey and Bridges say, "Mighty bad road"; Noell says, "Awful bad road"; Stephens, "Very bad road." However, when we come to the phonograph records from which Dalhart copied, they all—Columbia; Brunswick; Harrell, OKeh; Whitter, OKeh; and Dalhart on both the Edison and Victor records—say, "It's a mighty rough road." If George wrote his text when he says he did, and was the first to use the word "rough" to describe the road, it is strange that not a single other early author used the word "rough," but "bad."

The plaintiff might with some slight plausibility say that he used the word "rough," and others departed from it when copying his song, were it not for the fact that his song shows signs of copying, even mistakes which appear only in Dalhart.

One of such mistakes occurs in the third

line of Dalhart's third stanza, in the use of the word "average" for the word "air-brake." This stanza reads as follows:

"It's a mighty rough road from Lynchburg to Danville,
And a line on a three mile grade.
It was on that grade that he lost his average
And you see what a jump he made."

George followed him and said the same thing. That the "air-brakes" did not work seems to be in accord with the facts. No other text than Dalhart's uses the word "average." All the rest use "air-brakes" or some such expression. For example, as Gordon shows: "Holtsclaw has 'lost his air.' Hunt has 'lost control of his air brakes'. Lineberger does not mention it. Lewey has, 'Although his air was bad'. Noell has: 'Although his air brakes was bad', and 'air brakes failed him.' Bridges has: 'Lost his air brakes,' and 'although his air brakes was bad'. Stephens has—'lost his air.' Whitter, OKeh record—'lost his air brakes.' Columbia record by Tanner—'lost his air brakes.' Whitter's printed version, 'lost his air brakes.' Brunswick record, 'lost his air brake.' Columbia record by Thompson—'lost his air brakes.' OKeh record by Harrell—'lost his air brakes.' Welsh versions in the Cloverleaf does not mention it. The Globe version of January 1925 does not mention it. The Globe version of January 1927 does —'lost his air brakes.' Dalhart ' on the Edison and Victor—'lost his average' "; George, "lost his average."

Dalhart says that he misunderstood the word, "air-brakes" when he listened to Whitter's phonograph record. George made a long, rambling, but incredible, explanation of why he used "average" in his text, for it did not fit in with the facts. This Dalhart readily saw, and immediately admitted it, but George could not do so without defeating his case. It seems to us too plain for argument that George got the word from Dalhart's record which he heard played immediately after the alleged "offers of money by the Victor Company" appeared in the News Leader.

There are other similarities between Dalhart and George, but enough has been said to show their character and to force the conclusion that the correspondence between them is not a mere accidental coincidence. This conclusion is strengthened by the testimony of Walter W. Rowles who is now a tobacco grower in Campbell county, Va. He was born near Gretna, Va., which is on the Southern Railroad between Lynchburg and Danville. He was a railroad man in his younger days. He was with the Norfolk & Western seven or eight years, and with the Seaboard Airline for a while after that. He knew the engineer on this train for ten or twelve years before his death. He testified that the plaintiff, who had been a detective, went to his home several times down on the farm about 35 miles from Lynchburg, to see him, and tried to get him to testify that the plaintiff had written the song for him on a certain day in a barber shop run by a colored man by the name of Smith Dickerson who was said to remember that the plaintiff wrote the song for some one, but could not remember for whom. Rowles said that the plaintiff told him that he was not allowed to tell anybody what he would give him, if he won, but said, "If I win, you'll get a piece" of the pie. Rowles protested that he did not remember any such fact to which George wanted him to testify, nor the particular day on which the plaintiff wanted him to swear that he was in the barber shop. He said: "It might be proved that I was the devil knows where on that day. I don't know where I was." The plaintiff replied that "there wasn't a man in the United States who could tell where I was on that day."

This testimony may account for the suspicious agreement among plaintiff's witnesses as to dates and other facts.

George admitted, after much questioning, that he took a copy of his song with him when he went to the home of his neighbor, Mr. Coles, shortly after the items were published in the News Leader to hear the Victor record played for the purpose of "comparison," and that he at that time inserted the words, "whistle whistle" in his text in the second line of the fifth stanza. This he could not remember until the third cross-examination, and did not remember it then until questioned by the court. He inserted these words "in making a comparison" of his text with Dalhart's. He was then preparing his case to secure the "offers of money by the Victor Company," as advertised by the News Leader. The question cannot but arise: What other insertions, if any, did he make?

George testified that the copies of the musical bars and notes of his song were traced over carbon paper from the sheet of music of "The Ship That Never Returned," while the words were written in pencil. Webster Melcher, an analytical chemist of wide experience, and an expert on the chemical composition used in written documents, testified that the essential part or basic ma-

terial of the carbon used by George was "gas black," and the coloring matter put in to tone it was "analine blue," the materials which are used for such purpose today, but these materials were not used in 1903, nor for a long time thereafter. The basic material used then was "lamp black," and the coloring matter was "Prussian blue." Consequently the materials contained in the carbons which George says he used in 1903 to make his copy were unknown then, and could not have been used by him at that time, but they are the materials which were used in 1927, and this testimony stands uncontradicted.

Again, Melcher is a handwriting expert of considerable prominence. He had seven admitted samples of George's writing in 1901 and several letters admitted to have been written by him in 1927. The characteristics of a person's handwriting change considerably in twenty-six years. After an exhaustive examination of George's writing in 1901 and in 1927, Melcher said that the characteristics of the writing of the song in question were unquestionably those of 1927 or thereabout. The analysis of the writing of the two periods justify, if they do not actually force, this conclusion.

The evidence, taken as a whole, it seems to us, establishes beyond question that the plaintiff was not the author of the song put upon the defendant's record.

But the trial court found that the plaintiff did compose and write the song shortly after the wreck occurred on September 27, 1903, and this finding should be sustained, appellee argues, because trial courts which hear the witnesses, see them testify, and observe their demeanor on the stand, are in a better position to pass upon their credibility and weigh their testimony than appellate courts. This is true. Facts found by a trial court will not be reversed by an appellate court unless they are obviously wrong and clearly against the weight of the evidence. Metropolitan National Bank of Pittsburg v. Rogers et al. (C. C. A.) 53 F. 776; Moore v. Ford Motor Company (C. C. A.) 43 F. (2d) 685; Kimberly v. Arms, 129 U. S. 512, 9 S. Ct. 355, 32 L. Ed. 764; Crawford v. Neal, 144 U. S. 585, 12 S. Ct. 759, 36 L. Ed. 552.

It is the duty of a plaintiff, however, to establish his rights in the trial court by a preponderance of the evidence, and it is the duty of an appellate court in reviewing the record to examine the evidence and determine as best it can whether or not the plaintiff has sustained the burden resting upon him. Laursen v. Lowe (C. C. A.) 46 F. (2d) 303; Virginian Railway v. United States, 272 U. S. 658, 675, 47 S. Ct. 222, 71 L. Ed. 463. This the plaintiff has not done. The testimony of all his witnesses, except that of himself, was taken by deposition, and the trial court never saw nor heard them. Consequently this court has the same opportunity to pass upon the credibility of his witnesses and to weigh their testimony and the documentary evidence as did the District Court.

The depositions of his witnesses are far from convincing.

Practically all of them testified that George composed and wrote the song within a week or two after the wreck. Mrs. Etta (George) Lewis, daughter of the plaintiff said that her father composed the song, and that she sang it at the home of Miss Minnie McNeeley within about a week after the wreck; that this was the first place that she played it; that Miss McNeeley had just gotten a new organ and wanted her to play and sing the song. George, himself, testified that he sang it at Minnie McNeeley's within two weeks after the wreck, and that it was first played there. But it was later definitely established that Minnie McNeeley never had an organ in her home until May, 1907. The organ was given to her by her brother at that time.

It was further testified that the song had been sung at the home of Mr. W. H. Simpson about that time, Mr. George not having an organ or other musical instrument in his home. But it was likewise established that Mr. Simpson never had an organ until November 27, 1907, when an organ was delivered to him by Sears, Roebuck & Co. at Greina, Va., which was then called "Elba." This shows how unreliable as to dates and facts oral testimony is even when witnesses are not biased and not moved by other considerations than truth. The testimony of these two witnesses may be said to be typical of the testimony of George's other witnesses. There is a striking and suspicious similarity running through their entire testimony. It does not meet the requirements of the rule laid down by the Supreme Court. In patent cases anticipations must be proved by evidence so cogent as to leave no reasonable doubt in the mind of the court that the transaction occurred substantially as stated. In a copyright case, to which the case at bar is similar, "it is therefore much more important that when the supposed author sues for a

violation of his copyright, the existence of those facts of originality, of intellectual production, of thought, and conception on the part of the author should be proved than in the case of a patent-right." Burrow-Giles Lithographic Company v. Sarony, 111 U. S. 53, 4 S. Ct. 279, 282, 28 L. Ed. 349; Deering v. Winona Harvester Works, 155 U. S. 286, 300, 15 S. Ct. 118, 39 L. Ed. 153.

The plaintiff's witnesses do not satisfy us that he wrote the song, and the documentary evidence so discredits his testimony as to lead us to the conclusion that he has not borne the burden which the law casts upon him. His position was not strengthened, but rather weakened, by the evidence of the defendant.

The plaintiff says that the decree from which the appeal was taken was not final, but interlocutory, and, since the appeal was not applied for within thirty days from the entry of the decree as required by title 28, section 227 USCA, this court is without jurisdiction and should dismiss the appeal for that reason without passing upon the merits of the issues involved.

█ The defendant cannot prevail if the decree is interlocutory and not final. It is necessary, therefore, to determine whether the decree is interlocutory or final within the intendment of the statute.

█ It should be said, however, that the decree was plaintiff's, prepared by him, and signed by the trial judge who thus made it the decree of the court. It was marked as a "final decree" by the plaintiff and was so understood by the court when it was signed. The appellant was thus led to rely upon it as a "final decree." After thirty days had passed, the appellee, who had misled the appellant, if the decree is not final, may not repudiate his own acts to the injury of the appellant. To permit this would be inequitable. If there is doubt it should be resolved against the appellee. Pleasants v. Southern Railway Company, 93 F. 93, 97 (C. C. A. 2); Mercantile Trust Company v. Chicago, etc., 123 F. 389 (C. C. A. 7); McGourkey v. Toledo & Ohio Central Railway Co., 146 U. S. 536, 13 S. Ct. 170, 36 L. Ed. 1079.

█ The decree was final because it settled the substantial rights of the parties, and all that remained was to determine the amount of those rights. Rector v. United States (C. C. A. 8) 20 F.(2d) 845, 872. Issue had been joined on the substantial rights of the plaintiff, a final hearing in open court had been held thereon, elaborate arguments had been made, briefs had been submitted after mature deliberations, and a "final decree" was entered thereon determining those "substantial rights," and nothing was left to be done except to determine the amount of those rights.

In the case of Forgay v. Conrad, 6 How. (47 U. S.) 201, 204, 12 L. Ed. 404, a bill was filed to set aside as fraudulent certain deeds for lands and slaves and for an accounting of the rents and profits of the property. The decree of the trial court adjudged the deeds to be fraudulent, directed the delivery of the property to be made to the complainants, and among other things directed one of the complainants to pay $11,000 with accounting of profits for the property taken. On appeal to the Supreme Court, Chief Justice Taney said: "When the decree decides the right to the property in contest, and directs it to be delivered up by the defendant to the complainant, or directs it to be sold, or directs the defendant to pay a certain sum of money to the complainant, and the complainant is entitled to have such decree carried immediately into execution, the decree must be regarded as a final one to that extent, and authorizes an appeal to this court, although so much of the bill is retained in the Circuit Court as is necessary for the purpose of adjusting by a further decree the accounts between the parties pursuant to the decree passed."

That case is practically on all fours with this case. It decided the issues on the merits. The complainant was entitled to have it carried into effect, and all that was left to be done was "to adjust the account between the parties" by a further decree. Chief Justice Chase in Thomson v. Dean, 7 Wall. (74 U. S.) 342, 346, 19 L. Ed. 94, said: "We think that the current of decisions fully sustains the rule laid down by the late Chief Justice in the case of Forgay v. Conrad, and which we again declare in his own language." The above quotation in the Forgay Case then followed.

In the case of St. Louis, Iron Mountain & Southern Railroad Company v. Southern Express Co., 108 U. S. 24, 28, 2 S. Ct. 6, 8, 27 L. Ed. 638, Chief Justice Waite defined a final decree as follows: "A decree is final, * * * when it terminates the litigation between the parties on the merits of the case, and leaves nothing to be done but to enforce by execution what has been determined. Under this rule we think the present decree is final. The suit was brought to compel the

railway company to do the express company's business. The controversy was about the right of the express company to require this to be done on the payment of lawful charges. * * * The controversy which the express company has had referred to the master, about the compensation to be paid for the transportation during the pendency of the suit, does not enter into the merits of the case."

The decree in the above cases terminated the litigation as to the merits. Nothing remained to be done but to carry the decree into execution, and the accounting was purely ministerial and not judicial and only in aid of the execution of the decree. The master in the case at bar had only to perform the ministerial duty of executing the decree of the court. While in time such a decree may not be literally final, in the intendment of the statute, it is final. Marian Coal Co. v. Peale (C. C. A.) 204 F. 161, 164; Winthrop Iron Co. v. Meeker, 109 U. S. 180, 3 S. Ct. 111, 27 L. Ed. 898; In re Farmers' Loan & Trust Co., 129 U. S. 206, 9 S. Ct. 265, 32 L. Ed. 656; Lewisburg Bank v. Sheffey, 140 U. S. 445, 11 S. Ct. 755, 35 L. Ed. 493; Lovell-McConnell Manufacturing Company v. Automobile Supply Manufacturing Co., 235 U. S. 383, 35 S. Ct. 132, 59 L. Ed. 282. Accordingly it was not necessary to take the appeal within thirty days as the appellee contends.

It follows that the decree must be reversed.