BOROUGH OF FORD CITY, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

No. 14832.

United States Court of Appeals Third Circuit.

Argued Oct. 22, 1964.

Decided April 28, 1965.

Rehearing Denied May 26, 1965.

**646**

Howard O. Sigmond, Dept. of Justice, Lands Div., Washington, D. C., Ramsey Clark, Asst. Atty. Gen., Gustave Diamond, U. S. Atty., Pittsburgh, Pa., Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C., for appellant.

John B. McCue, McCue & Bertocchi, Kittanning, Pa., George P. Cheney, Jr., Pittsburgh, Pa., for appellee.

Before McLAUGHLIN, KALODNER and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Plaintiff-appellee is a municipality of the Commonwealth of Pennsylvania. This litigation arose out of alleged damage to its sewer system claimed to have been due to the construction in 1928 by the Department of the Army of a lock and dam on the Allegheny River about five and a half miles below Ford City. Suit was filed September 20, 1960, solely on the authority of a special jurisdictional act of Congress (P.L. 86–538, 74 Stat. 252) which eliminated laches and any statute of limitations in connection therewith. The amended complaint is based upon the Fifth Amendment, " * * * nor shall private property be taken for public use without just compensation."

In 1928, plaintiff owned and operated, as it still does, a gravity flow sewer system which flowed into the Allegheny. At that time, defendant, in connection with its work of improving the navigation on the Allegheny by deepening its channel, built a lock and dam across its bed at Logansport. It is admitted that the Allegheny River generally and particularly at Ford City, is a navigable stream. It is stipulated that after the erection of the lock and dam, the pool elevation at Ford City approximated 770 feet mean

sea level (hereinafter ft. m.s.l.) for protracted periods. Plaintiff claims that the installation of the lock and dam caused a rise of about 10 feet at the Ford City sewer outlet which caused serious damage to the system, the city's streets and necessitated constant pumping operations.

As its first point appellee urges that appellant's appeal is out of time. What happened was that the issue of liability was tried to the court. Judgment as to liability was entered January 29, 1963. That was an interlocutory order not appealable. Victor Talking Machine Co. v. George, 69 F.2d 871 (3 Cir. 1934), 105 F.2d 697 (3 Cir. 1939), cert. den. 308 U.S. 611, 60 S.Ct. 176, 84 L.Ed. 511; Milbert v. Bison Laboratories, 260 F.2d 431 (3 Cir. 1958). The trial judge recognized this at a pretrial conference April 16, 1962 when he was reminded by counsel of a previous discussion with him concerning the Government appeal situation in the event there was a finding against the Government, with particular reference to the " * * * question of having a stay order entered [as to the damage issue] so that we might pursue the question of appeal in case of adverse ruling." The court as to this said, "The statement I heretofore made, I retract that and will not do that. * * * I will not give you a certificate of appeal." Subsequently the suit was called for trial on the damage branch. At that time a stipulation of what was really a contingent settlement was entered into by the parties through their attorneys which was expressly " * * * without prejudice to the right of the Government to appeal as to liability and without prejudice to the Borough of Ford City to attack such appeal." The order of the court of November 4, 1963, notes that " * * * stipulation and agreement of counsel for both parties in the above entitled matter having been filed, judgment of damages is hereby entered * * *." Notice of appeal by the defendant was filed the following day, November 5, 1963. The appeal was within time and is properly before this court.

It is accepted by the plaintiff and the trial judge, as it must be, that the navigational servitude of the Federal Government allows it to take private property without compensation when it is controlling and regulating navigable waters in the interest of commerce. This governmental right extends to the entire bed of the stream involved, including the lands below the ordinary high-water mark; the converse of this is also true i.e. " * * * the Government must compensate for any taking of fast lands which results from the exercise of the power." United States v. Virginia Electric & Power Co., 365 U.S. 624, 627–628, 81 S.Ct. 784, 788, 5 L.Ed.2d 838 (1961). However, the Government, in the exercise of the navigation servitude can raise the water level above the ordinary high-water mark and not be liable. If the value of the property is due to the flow of the stream and the riparian location, there is no actual taking of property which requires compensation because of the Fifth Amendment. United States v. Willow River Co., 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945); United States v. Twin City Power Co., 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956). That rule makes the dominant practical issue before us, whether the Government by its construction of the lock and dam raised the Allegheny River ordinary high-water mark in the area of the Ford City sewer outlet. If it did, the defendant is responsible for any damage caused plaintiff by reason thereof.

The district court held that defendant's construction had raised the ordinary high-water mark. Its authority for this is a quotation from the decision in United States v. Chicago B & Q R. Co., 90 F.2d 161, 170 (7 Cir. 1937), cert. den. 302 U.S. 714, 58 S.Ct. 33, 82 L.Ed. 551, which states: "The river bed is the land upon which the action of the water has been so constant as to destroy vegetation. It does not extend to nor include the soil upon which grasses, shrubs and trees grow." From this the judge concluded that the ordinary high-water mark of the Allegheny was where vegetation is

destroyed. Actually this is not the teaching of Harrison v. Fite, 148 F. 781, 783 (8 Cir. 1906), upon which the Chicago B & Q R. Co. expressly relies. Harrison holds primarily that the bed of a river " * * * is that soil so usually covered by water that it is wrested from vegetation and its value for agricultural purposes is destroyed." Howard v. Ingersoll, 54 U.S. 380, 13 How. 381, 14 L.Ed. 189 (1851), upon which Harrison in turn is based and which is the leading opinion on the particular point, makes it very clear that the vegetation test for a navigable stream's ordinary high-water mark means not that within such line all vegetation has been destroyed by the water covering the soil but that the soil has been covered by water for sufficient periods of time to destroy its value for agricultural purposes. The Howard opinion, p. 415, defining the outer line of the bed of the river there involved said:

"It neither takes in overflowed land beyond the bank, nor includes swamps or low grounds liable to be overflowed, but reclaimable for meadows or agriculture, or which, being too low for reclamation, though not always covered with water, may be used for cattle to range upon, as natural or uninclosed pasture. But it may include spots lower than the bluff or bank, whether there is or is not a growth upon them, not forming a part of that land which, whether low or high, we know to be upland or fast lowland, if such spots are within the bed of the river. Such a line may be found upon every river, from its source to its mouth. It requires no scientific exploration to find or mark it out. The eye traces it in going either up or down a driver, in any stage of water."

■ This principle is followed in a great number of well considered opin-

ions some of which are cited below.[1] We are satisfied that the sound law as to what constitutes the river bed of a navigational stream is as carefully outlined in the Harrison opinion i. e. the land upon which the waters have visibly asserted their dominion, the value of which for agricultural purposes has been destroyed. The value for agricultural purposes is destroyed where terrestrial plants not all plant life ceases to grow. Just as definitely the same law is that the bed of such stream " * * * does not extend to or include that upon which grasses, shrubs and trees grow though covered by the great annual rises." Harrison v. Fite, supra 783.

■ The vegetation test is useful where there is no clear, natural line impressed on the bank. If there is a clear line, as shown by erosion, and other easily recognized characteristics such as shelving, change in the character of the soil, destruction of terrestrial vegetation, and litter, it determines the line of ordinary high-water. Rutten v. State, 93 N.W.2d 796, 799 (N.D.1958); Diana Shooting Club v. Husting, 156 Wis. 261, 145 N.W. 816 (1914); Willis v. United States, 50 F.Supp. 99 (W.Va.1943). Also a test of the distinct line is the destruction of terrestrial vegetation so these are not really two separate tests but must, of necessity, complement each other.

■ Another important consideration in determining the line is the character of the bank or shore at the particular site in issue. If it is difficult to ascertain the line of ordinary high-water at this site, recourse may be had to other sites along the same stream to determine the line. Diana Shooting Club v. Husting, supra, 145 N.W. at 820.

Having the above fundamentals in mind, the factual situation before us is simply determined. Appellee depended

1. Paine Lumber Co. v. United States, 55 F. 854, 864–865 (E.D.Wis.1893); City of Cedar Rapids v. Marshall, 199 Iowa 1262, 203 N.W. 932, 933 (1925); Dow v. The Electric Co., 69 N.H. 498, 45 A. 350 (1899); Hartley v. Crawford, 81½ Pa. 478, 485 (1875); Rutten v. State, 93 N.W.2d 796, 799 (N.D.1958); In re Minnetonka Lake Improvement, 56 Minn. 513, 58 N.W. 295, 297 (1894); Welch v. Browning, 115 Iowa 690, 87 N.W. 430, 431 (1901).

upon its witness Shannon for the fixing of the 1928 pertinent Allegheny River ordinary high-water mark. This was Shannon's first attempt to determine such a location. He minored in engineering and majored in forestry. He was asked by appellee's attorney, "You are in practice at this time as an engineer in forestry. Is that correct?" He answered:

"Well, I have a firm of professional service individuals, providing services in engineering, forestry, surveying, landscape architecture and other related fields such as architecture, photogrammetry,"

He said he was engaged by appellee "concerning an observation of vegetation along the Allegheny River." Then he was asked by the attorney for the appellee, "What did you do in regard to this observation?" He answered:

"Well, first I consulted with yourself, counselor, and with the borough engineer, primarily to find out what the purpose of this observation was. And mention had been made of a term known as ordinary high water which I was unable to find any description or definition of, by perusal of standard engineering references. And upon advice that the vegetation was probably the most important factor plus my own reconnaissance of the river banks throughout the regions of Ford City, I concluded that the vegetation would probably be the item which we could observe with some reasonable degree of achieving a result."

Shannon said that he found a line where vegetation ceased to grow and took readings of the elevations at various points, all within 6,350 feet of river bank which was also in the immediate vicinity of Ford City itself. It was admitted that in this area it was hard to find points where measurements could be taken. On cross-examination he was asked the following question and replied as stated:

"Q. Did you have an opportunity of consulting with your counsel to consider the language of the legal cases on the subject, of what the law considered the ordinary high water mark to be? A. Well, I concluded that ordinary high water mark was a legal term, but I couldn't find it in the engineering references and I couldn't honestly find on the river banks which might, in a legal way, establish ordinary high water marks with the exception of vegetation.

"Q. My question was, did you read any cases or did your counsel refer you to any language that is quoted in the legal cases, which defined ordinary water line? A. I believe he quoted some language to me, but I couldn't restate it verbatim."

The final question to Shannon on cross-examination and his answer thereto were:

"Q. *This area down to the line that you selected, could it be used for agricultural purposes?* A. *No.*" (Emphasis supplied).

The defense moved to strike the Shannon testimony on the ground " * * * that when he made his examination he was not looking for a vegetation line as defined by the courts generally but was sent out merely to look for a line in which he thought that he could find the effect of the river on vegetation, and that he, in the absence of having further instruction in the matter, was really not qualified to arrive at a decision as to which line should have been considered." That motion was denied. The trial court's finding of fact that " * * * the post-dam ordinary high-water mark at the average point in the Borrough is 773.78 feet." Borough of Ford City v. United States, 213 F.Supp. 248, 254 (W. D.Pa.1963) is the exact Shannon mathematical calculation, the sole source of such figure in the trial transcript. It is agreed that given the post-dam ordinary high-water mark with other available data, the pre-dam ordinary high-water mark is readily ascertainable. Using the Shannon post-dam figure, the pre-dam mark would be 766.8 feet. The Shannon pre-dam ordinary high-water mark which was also his alone, was found by the court as a fact.

Edward F. Twoney, a consulting engineer, employed by Ford City in connection with its sewage plant was also a plaintiff's witness. His testimony will be dealt with at length later in this opinion.

Testimony on behalf of appellant was given by Dr. Hartman of the University of Pittsburgh who holds a doctorate in botany and is a specialist in limnology. He had made an exhaustive survey of the critical river location. A number of pictures taken by him on his survey were explained by him and marked into evidence. He testified at length of finding the transition line between the area of essentially terrestrial plant communities and the area affected by repeated inundation. He did not believe that there would be any agricultural use or value to the land below that line. His post-dam ordinary high-water marks were, at the First Street outlet, 776.4 ft. m.s.l.; near Eighth Street Extended, 776.9 ft. m.s.l. and at the powerhouse, 777.1 ft. m.s.l.

E. M. Cole, chief of the planning and reports section of the Corps of Engineers also testified in the appellant's case. He had made a study of the Allegheny post-dam high-water mark at Ford City. Despite constant harassing examination by the trial judge, Mr. Cole testified thoroughly and explicitly to the vital change in the character of the vegetation and of the river bank in the particular section and of finding the impress of the line of ordinary high-water. In his judgment the river flow of 62,000 c.f.s. (cubic feet per second) at Ford City gave the correct profile of post-dam ordinary high-water. From that source material the witness calculated the post-dam high-water at the three sewer outlets as 776.5 ft. m.s.l., 776.9 ft. m.s.l. and 777.1 ft. m.s.l. Converting the flow to open river or pre-dam conditions resulted in corresponding pre-dam ordinary high-water elevations of 771.4 ft. m.s.l., 772.5 ft. m.s.l. and 772.9 ft. m.s.l.

Dr. Philbrick, a Corps of Engineers geologist strongly supported the testimony of the witnesses Hartman and Cole

as to the natural high-water line they had found.

The Government witnesses all made use of shelving, erosion, and litter in substantiation of their findings. The latter covered the entire pool expanse not just the limited section in the vicinity of Ford City.

In response to a question by the court, plaintiff's witness Twomey said, "Ordinary high water is a very confusing word to me." The attorney for Ford City asked him, "Mr. Twomey, you stated that you arrived at an opinion from observing photographs as to the vegetation line on the fourteenth of April, with a flow of about 39,000 feet. Is that correct?" The witness answered "Between 39 and 40,000." Again replying to the court the witness said, " * * * In other words, we assume that if the vegetation—*assuming that 40,000 is correct*—cubic feet per second—we know that under present date condition, the elevation in the Allegheny River would be 755½." (Emphasis supplied). During the Twomey evidence, the court suggested to counsel for Ford City that he introduce the pictures that had been made by United States Engineers in the course of a joint plaintiff and defense tour by barge of the Allegheny River in the environs of Ford City. The attorney said "I don't care to introduce them, your Honor." Mr. Twomey had not been aboard the barge. The Ford City attorney stated that there had been quite a bit of disagreement as to the proper spots to take pictures and exactly where the vegetation line was. He advised the court that "Mr. Shannon, an engineer representing the city, Ford City, was present * * * He is prepared to take the stand and testify on what he believed the high water mark is, as a result of that." The judge then commented: "Again, as I have told you men many times before, I think Congress wanted you fellows to do something about adjusting it." He went on to note the adversary attitude between counsel for the parties.

The above gives some idea of the vagueness and lack of quality of the Twomey

evidence with respect to the specific trial issues. We have above noted that the court's crucial finding of fact adopted Shannon's computation of the post-dam and pre-dam ordinary high-water mark. It would necessarily follow from this that the present agreed Allegheny pool elevation of 770 ft. is higher than Shannon's ordinary high-water mark of 766.8 ft. and that the dam construction was the cause thereof.

■ The district judge as trier of the fact was justified in disregarding Twomey's testimony but in accepting and depending upon the Shannon evidence he erred in law. He categorically held that the Allegheny River bed at Ford City is "land upon which the action of the water has been so constant as to destroy vegetation." Borough of Ford City v. United States, 213 F.Supp. 248, 251 (W.D.Pa. 1963). This was also Shannon's foundation in arriving at his mathematical conclusion of the post-dam high-water mark. As we have earlier detailed this is not the law. What the river or action of the water actually destroys is the value of its soil for agricultural purposes. The difference between the two definitions is vital here and generally and is readily discernible. It is merely a question of using the proper norm. By applying the latter, plus the additional tests, Messrs. Cole and Hartman found that the pre-dam ordinary high-water mark was 771.4, 772.5, 772.9 ft. m.s.l. at the three outlets. All of these marks are well above the admitted present pool level of 770 ft. m.s.l. The accuracy of the defense calculation was not challenged. It was the correctness of the line where the defense witnesses had located it by actual expert observation that was disputed.

■ Appellee argues strenuously in its brief that "The fact that the trial court found post-dam ordinary high-water mark to be the same as that testified to by the witness Shannon is not appealable." It anchors this on the proposition that the court had the right to rely on the testimony of that single expert witness " * * * despite other

testimony to the contrary and the Court of Appeals is not privileged to overrule the trial court." Appellee either misconceives the Shannon problem or refuses to face up to it. This is not a question of credibility of witnesses or weight of evidence. It is simply that Shannon's opinion evidence of situs of the post-dam ordinary high-water mark was totally predicated on a legally wrong premise. The test for ascertaining that mark passed along to him for his use was erroneous. The trial judge, forming his conception of the mark from the same source, accepted Shannon's findings and rested his decision completely on those findings. In this resultant situation reversal of the judgment and remand of the matter to the district court for the entry of judgment in favor of the defendant-appellant is indicated.

On the second point involved in this appeal the trial court holds in its opinion: "So, when the federal government improves navigable streams by means of locks and dams in the interest of navigation and thereby raises the ordinary high-water mark of the navigable stream or the normal pool level beyond the pre-dam ordinary high-water mark, and private property is damaged in whole or in part, said taking on the part of the government is in subordination to the Fifth Amendment and subject to the responsibility of the government for damages that are sustained as a proximate result thereof. * * * Furthermore, if the navigational servitude is exercised above the ordinary high-water mark, beyond the bed of the river, it is irrelevant that damage might have been caused by the underflowing of the land through percolation of the river waters rather than by flooding. See United States v. Kansas City Life Ins. Co., supra." On that basis the court found (1) that the dam did so raise " * * * the ordinary high-water mark * * * and the normal pool level above the pre-dam ordinary high-water mark," and (2) "the value of plaintiff's sewage system is not attributable solely to the flow of the Allegheny River and to its riparian loca-

tion but instead, the sewage system has value independent of the flow of the stream and the riparian location, value which has been damaged by the acts of defendant to an extent to be determined at the trial of the damages issue and therefore (3) the Borough of Ford City is entitled to recover against the United States." Borough of Ford City v. United States, supra, p. 252.

■ It is worthy of note that the ultimate holding on this phase of the appeal is again dependent on the raising of the pre-dam high-water mark which we have found did not occur.

Plaintiff-appellee in its brief under the caption of "The Court of Appeals has no right or duty to concern itself with the weight of the evidence or the credibility of witnesses" states that one of the principles governing the determination of whether there was a taking of its property under the Fifth Amendment " * * is that the United States may not, in the exercise of its commerce power, raise a navigable stream to its ordinary high-water mark and maintain it continuously at that level in the interest of navigation without being liable for the effects of that change in the destruction of property beyond the bed of the stream." It says further that " * * * if the United States raised a navigable stream permanently to its ordinary high-water mark and thereby causes the raising of the ground water table so as to permanently inundate property beyond the bed of the stream, the United States is liable for the effects of that change in the destruction of property beyond the bed of the stream. The district court found that the river was permanently raised at Ford City to a point exceeding pre-dam ordinary high-water mark and that approximately one-third of plaintiff's sewers were permanently inundated by the under-flowing of the land through percolation."

The conclusion to plaintiff's brief reads:

"CONCLUSION

"It is submitted that the Circuit Court of Appeals has no jurisdiction to hear this appeal because of failure of the defendant to take timely appeal from the judgment on liability dated January 29, 1963 and/or because the defendant by actions of its attorneys is estopped from filing this appeal after 60 days from date of the judgment of January 29, 1963. The appeal should be denied for the further reasons that the district court did adopt the correct standard in determining high water mark; that the Circuit Court of Appeals has no right or duty to concern itself with the weight of the evidence or the reliance of the district court on the testimony of a single expert witness despite other testimony to the contrary."

As seen plaintiff also founds its claim for damages to the sewer system beyond the bed of the Allegheny squarely upon the alleged raising of the river to a point beyond the pre-dam ordinary high-water mark. Both the court and the plaintiff assert that their general contention on this point is supported by United States v. Kansas City Ins. Co., 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950). The facts in that decision differ radically from those in this appeal. There was no pre-dam, post-dam problem in that suit. There the Government by means of a dam raised a navigable stream to its ordinary high-water mark and maintained it continuously thereafter in the interest of navigation. The damaged land was not on the stream, was in no sense riparian but rather a farm bordering on a non-navigable tributary which entered the navigable stream one and one-half miles below the farm. The recent United States Supreme Court opinion in United States v. Virginia Electric and Power Co., 365 U.S. 624, 628, 81 S.Ct. 784, 788, 5 L.Ed.2d 838 (1960) gives us the tight scope of the Kansas City holding:

"Since the privilege or servitude only encompasses the exercise of this federal power with respect to the stream itself and the lands beneath and within its high-water mark, the Government must compensate for

any taking of fast lands which results from the exercise of the power. This was the rationale of United States v. Kansas City Life Ins. Co., 339 U.S. 799 [70 S.Ct. 885, 94 L.Ed. 1277], where the Court held that when a navigable stream was raised by the Government to its ordinary high-water mark and maintained continuously at that level in the interest of navigation, the Government was liable 'for the effect of that change [in the water level] upon private property beyond the bed of the stream.' 339 U.S., at pages 800–801, 70 S.Ct. at page 886. See, also United States v. Willow River Co., 324 U.S. 499, 509 [65 S.Ct. 761, 767, 89 L.Ed. 1101]."

United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917), similarly to Kansas City, concerned a Government improvement on a navigable stream which caused the flooding of plaintiff's land in and adjacent to a non-navigable stream. Compensation for the damaged land was granted. Directly pointing to the narrow restriction of the tributary doctrine is United States v. Willow River Power Co., supra. In that action compensation was sought for the reduction of a power head caused by a Government dam which raised the level—above the ordinary high-water mark—of the navigable river into which the Power Company dropped the water from its dam built on a non-navigable tributary. The claim was denied because the company's loss of power occurred within the bed of the navigable river where the Government had the right to change the river's level in the interest of navigation. The Court held that Cress did not apply; that in Cress " * * * the navigation interest was held not to be a dominant one at the property damaged; here dominance of the navigation interest at the St. Croix [the navigable river] is

clear." 324 U.S. p. 506, 65 S.Ct. p. 766. In addition Willow River determined that this taking did not require compensation because the value of power head was inherent in the flow of the stream and its riparian location.

The property before us assertedly damaged is a gravity flow sewer system [2] designed and constructed by this Allegheny riverside municipality to obtain the natural advantage of dumping the city sewage directly into the navigable stream and so, disposing of it. Whether this was commendable sanitation practice is not at issue. The trial court found that there was some underflow from the river which produced harm to the sewer pipes and necessitated increased pumping which "was just as destructive as if the land was submerged." It should be said here that there is not one word of testimony that any Ford City fast land whatsoever was harmed in the slightest. Nor is there the faintest support in the record that a modern sewer system, replacing the 1898 model before us, would not obviate whatever difficulty that may be existing.

 In any event what we have in this appeal is fairly and plainly a sewer system that is a riparian location unit. It is an operation conceived to take advantage of the use of the flow of a navigable stream. It is utterly dependent on the Allegheny. It owes its existence and entire function to that navigable river. As the Supreme Court held in Willow River, p. 506, 65 S.Ct. p. 766, " * * * here dominance of the navigation interest * * * is clear." To same effect United States v. Twin City Power Co., supra. The Kansas City formula, such as it is, by its very terms has no bearing on this litigation.

The judgment of the district court will be reversed and the case remanded to that court for the entry of judgment in favor of the defendant-appellant.

---

**2.** See also City of Eufaula, Alabama v. United States, 313 F.2d 745 (5 Cir. 1963); City of Demopolis, Alabama v. United States, 334 F.2d 657 (Ct.Cl.1964).

These cases also deal with the alleged taking of a gravity flow sewer system by the United States in the exercise of its navigational servitude.