Fred PANKRATZ, Appellant,

v.

STATE of Alaska, DEPARTMENT OF HIGHWAYS, Appellee.

No. 5543.

Supreme Court of Alaska.

Sept. 24, 1982.

C.R. Kennelly, Kennelly, Azar & Donohue, Fairbanks, for appellant.

Gary Foster, Asst. Atty. Gen., Fairbanks, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BURKE, C.J., and RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

## OPINION

CONNOR, Justice.

### FACTS

This is an appeal, after nonjury trial, from judgment against plaintiff Fred Pankratz in his action for property damage allegedly caused by improper construction of a state highway bridge, and in favor of the state on its counterclaim for encroachment, obstruction of a watercourse and conversion. Pankratz argues on appeal that the judgments on the complaint and counterclaim are clearly erroneous in light of the evidence presented. Corollary issues raised by Pankratz involve right to jury trial, motion for summary judgment and res judicata.[1]

---

1. We note that appellant's brief was of little assistance to us as to most of the questions raised on appeal.

This is the second time these parties have been before us. In the first case, *State, Dept. of Natural Resources v. Pankratz* (hereafter *"Pankratz I"*), 538 P.2d 984 (Alaska 1973), *modified sub nom., Honsinger v. State,* 642 P.2d 1352 (Alaska 1982), the state brought an action to quiet title to a gravel bar that had emerged adjacent to Pike's Island, an island in the Chena River owned by Pankratz. The superior court awarded title to Pankratz on the theory that the gravel bar had naturally accreted and he, as the riparian owner, was entitled to the benefit of the accretion. In determining the boundaries, the court relied on a 1973 survey showing the mean high water mark at 418.5 feet. The superior court awarded title to property lying above the 418.5 mark to Pankratz and property lying below the 418.5 mark to the state. The state appealed the decision and we affirmed. Thus, at the close of *Pankratz I,* Pankratz owned the island and the gravel bar situated above the mean high water mark and the state owned the bed of the river and the portions of the channel between the island and the mainland lying below the mean high water mark.

Since the late 1960s, Pankratz has extracted and sold gravel from the island and gravel bar. The gravel pit now covers approximately eight acres and is filled with water. Pankratz eventually hoped to turn the area into a small boat marina. In 1975, he constructed an earthen dike around the river edge of the island and gravel bar. In 1975 and 1976, the state constructed a highway bridge across the Chena River, just upstream of Pankratz' property.

The appendix to this opinion is a diagram of a 1980 survey superimposed on the 1973 survey.[2] The broken line represents the 418.5 mark as established in *Pankratz I.* Also shown on the diagram are the approximate boundary of the gravel pit as of 1980, the highway bridge, and the 1980 418.5 mark. The dike lies between the gravel pit and the river, thus forming the current mean high water line.

The present litigation began in 1977 when Pankratz filed a complaint against the state, seeking injunctive relief and monetary damages. Pankratz alleged that the piers supporting the highway bridge were aligned to divert the natural flow of the river against his dike, thereby causing erosion of the dike. The state answered that the pier alignment was not the cause of the erosion. In addition, the state counterclaimed, alleging *inter alia* that portions of the dike were built on state property; that the dike obstructed the channel, a natural watercourse; and that Pankratz had converted gravel belonging to the state. After a thirteen-day nonjury trial, the superior court found against Pankratz on the complaint and in favor of the state on its counterclaim. This appeal by Pankratz followed.

## I. JURY TRIAL

Pankratz first asserts that the superior court erred in denying his request for a jury trial. Pankratz filed his complaint on October 21, 1977. The state originally answered on November 18, 1977, and filed an amended answer and counterclaim on October 9, 1978. Neither party requested a jury trial. The superior court's pretrial order of October 25, 1979, set the case for trial by the court. On March 14, 1980, Pankratz' attorney withdrew and a new attorney was substituted. On April 17, 1980, 18 days before the trial was scheduled to begin, Pankratz made his first request for a jury trial, apparently acknowledging untimeliness since he urged the court to relax its rules pursuant to the court's authority under Civil Rule 94.[3] On April 23, 1980, Pankratz filed his reply to the state's counterclaim and de-

---

**2.** At trial, the state introduced a superimposition of the two surveys as an exhibit and the trial court found that the exhibit was accurate. The appendix to this opinion is merely a diagram of that exhibit.

**3.** Alaska Civil Rule 94 provides:

"These rules are designed to facilitate business and advance justice. They may be relaxed or dispensed with by the court in any case where it shall be manifest to the court that a strict adherence to them will work injustice."

manded a jury trial, this time arguing compliance with Civil Rule 38.[4] At the pretrial conference on May 1, 1980, the court denied Pankratz' demand as untimely and refused to exercise its discretion to allow a jury trial.

■ Pankratz appears to argue that he is entitled to a jury trial on the issues raised by his complaint as well as those raised by the state's counterclaim. However, the right to trial by jury on issues raised in a complaint is waived if not demanded within 10 days of service of the answer. *Hollembaek v. Alaska Rural Rehabilitation Corp.,* 447 P.2d 67, 69 (Alaska 1968). Pankratz did not demand a jury trial by November 28, 1977, 10 days after service of the answer.[5] He therefore waived his right to have the issues raised in his complaint tried by a jury.

■ Pankratz' jury demand was also untimely as to the issues raised by the state's counterclaim. Civil Rule 12(a) specifies that the reply to a counterclaim must be served within 20 days after service of the counterclaim. Pankratz' reply was filed more than a year and a half after the counterclaim, and only 18 days before trial. On similar facts, the Second Circuit found a jury demand untimely. *Larson v. General Motors Corp.,* 134 F.2d 450 (2d Cir. 1943), *cert. denied,* 319 U.S. 762, 63 S.Ct. 1318, 87 L.Ed. 1713 (1943) and 326 U.S. 745, 66 S.Ct. 34, 90 L.Ed. 445 (1945).

■ The superior court was justified in denying Pankratz' jury demand on another ground. Civil Rule 16(e) provides that the pretrial order "shall control the subsequent course of the action unless modified by the judge to prevent manifest injustice."[6] The court's pretrial order specifically states in the first paragraph that "[t]rial will be to the Court." The order was signed by the superior court judge only and copies were sent to counsel for both parties. In *Hollembaek,* we held that, as to the issues raised in the complaint, the parties were bound by a pretrial order providing for a nonjury trial. 447 P.2d at 68–69. Pankratz seeks to distinguish *Hollembaek* since in that case counsel for both parties had signed the pretrial order.[7] However, in *Fairbanks Publishing Co. v. Francisco,* 390 P.2d 784 (Alaska 1964), the case relied on in *Hollembaek,* we held that the parties were bound by a pretrial order that was not signed by counsel. 390 P.2d at 799. Thus, Pankratz was bound by the pretrial order and the court correctly denied his demand for jury trial as

4. Alaska Civil Rule 38 provides in part:
   "(b) Demand. Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and *not later than 10 days after the service of the last pleading directed to such issue* . . . .

   .    .    .    .    .

   (d) Waiver. The failure of a party to serve a demand as required by this rule and to file it as required by Rule 5(d) constitutes a waiver by him of trial by jury. . . ."
   (emphasis added).

5. The state's amended answer, filed October 9, 1978, was nearly identical to its original answer. When the 10-day period has run, an amended pleading which does not raise new issues does not give rise to the right to demand a jury. 5 J. Moore, Moore's Federal Practice ¶ 38.39[2], at 353 (2d ed. 1982). In any case, Pankratz' demand was also more than 10 days after service of the amended answer.

6. Rule 16(e) reads in full:

   "(e) Pre-Trial Order. The judge shall make an order (to be drawn and submitted by counsel) which shall recite the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and which limits the issues for trial to those not disposed of by admissions or agreements of counsel. The attorneys shall affix their signatures to the order with respect to the stipulations and agreements set forth in the order. The order when entered shall control the subsequent course of the action unless modified by the judge to prevent manifest injustice. The pre-trial order shall cover such of the items in the form of order contained in the Appendix of Forms to these rules as may be appropriate, subject to such additions and modifications as the pretrial judge may deem advisable."

7. Pankratz also points out that in *Hollembaek* we reversed the superior court's denial of a jury trial on the counterclaim. This is irrelevant, since the counterclaim in that case was filed *after* the pretrial order, and the jury demand was timely under Rule 38.

to the issues raised in both the complaint and the counterclaim.

## II. MOTION FOR PARTIAL SUMMARY JUDGMENT

■ Pankratz moved for partial summary judgment on any issues raised by the state's counterclaim that were explicitly or implicitly decided, or that could have been decided, in *Pankratz I*. He specifically sought to bar the state from raising issues as to blocking the channel or river, damaging the state's bridge, impounding state water, or impeding the flow of state water. Pankratz' one page motion was unaccompanied by the required memorandum showing that there were no genuine issues as to material facts and that Pankratz was entitled to judgment as a matter of law. Civil Rule 56(c). The motion did request that the court "take judicial notice of the pleadings and findings and decisions" from the *Pankratz I* trial. At oral argument on the motion, Pankratz requested that the trial transcript from *Pankratz I* also be considered. This request was correctly denied as untimely.

■ The superior court granted the motion "as to legal issues," but denied the motion "with respect to specific facts." Apparently, by granting the motion "as to the legal issues," the court was merely saying that it intended to apply the law of res judicata. The court went on to deny the motion as to specific facts "because the Court has not been furnished with sufficient facts to grant what was decided in the other case, other than what's in the record before the Court." Thus, the judge seems to have found that the motion for summary judgment was *procedurally* deficient, in that it failed to provide him with enough information to enable him to decide which issues, if any, would be barred by res judicata. Where the scope of an earlier decision is unclear, a court should not grant summary judgment on res judicata grounds. *See* C. Wright and A. Miller, Federal Practice and Procedure § 2735, at 663–66 (1973). Thus, the superior court was correct in denying Pankratz' motion.

## III. PLAINTIFF'S COMPLAINT

■ Pankratz alleged in his complaint that the piers supporting the state highway bridge were aligned so that the natural flow of the river was diverted and ran into his dike. He claims that the diversion of the water caused his dike to erode and that the state failed to protect his dike with riprap. Pankratz sought an injunction against the state to prevent such erosion and requested damages for the erosion that had already occurred. The superior court found that the dike was not constructed to be a permanent structure, in that it was not properly rizapped and was not high enough. The court further found that the bridge piers were properly aligned; that the bridge did not improperly divert the flow of the river; and that the bridge was not the cause of any unusual or improper erosion to Pankratz' dike. Pankratz argues that the superior court's findings are clearly erroneous.

The law on this issue is clear and is not disputed by the parties. If the bridge's alignment caused damage to Pankratz' property, then the state is liable for the damage. *G & A Contractors, Inc. v. Alaska Greenhouses, Inc.*, 517 P.2d 1379 (Alaska 1974); *Wernberg v. State*, 516 P.2d 1191 (Alaska 1973). Thus, the major issue is whether the alignment of the bridge piers did in fact cause erosion of the dike.[8]

There was a great deal of evidence presented at trial to support both sides of the issue. Pankratz introduced the following evidence in support of his complaint: (1) Lawrence Irving, a registered surveyor, testified that there was turbulence around the area of the bridge piers and that there may have been some erosion of the dike; (2) James Lundgren, a contractor for bridge construction, testified that the bridge piers were improperly aligned and were the cause

---

8. The state agrees that the dike is eroding, but argues that faulty construction of the dike is the cause of the erosion. The state also agrees that the bridge piers are pointed at the dike, but argues that such an alignment is proper.

of erosion of the dike; (3) Gerald Freese, an engineer, testified that the pier alignment was probably one factor causing the erosion; (4) Douglas Becker, who lives near the Pankratz property, testified that the pier alignment caused a log jam, which diverted the water across to Pankratz' property; (5) Clay Pankratz, Pankratz' son, testified that, based on his studies and observations, the bridge piers were causing erosion; and (6) Pankratz himself testified that the bridge alignment had drastically changed the river flow and caused erosion to his property. The state offered the following evidence to refute Pankratz' complaint: (a) Dr. Bob Carlson, a hydrology expert, testified that in his opinion the piers did not materially influence the direction of flow in the vicinity of the bridge and would not induce any more erosion than would take place without the piers; (b) Donald Halsted, an engineer and surveyor, testified that the bridge piers were properly aligned with the stream flow and that no erosion was caused by the alignment; and (c) Dean Griggs, a hydraulic engineer, testified that the piers were properly aligned. Further, the state provided a great deal of evidence that the dike itself was improperly constructed, thus causing erosion.

As we noted in *Pankratz I,* "[b]efore we will reverse the trial court's findings in judge-tried cases, we must have a definite and firm conviction that error was committed." 538 P.2d at 987 (footnote omitted). This deference is particularly appropriate where, as here, the bulk of the evidence is oral testimony. *Alaska Far East Corp. v. Newby,* 630 P.2d 533, 534 (Alaska 1981). In addition, the trial judge in this case took several trips to view the property. Based on our review of the evidence, we cannot say that the superior court's findings were clearly erroneous.

## IV.  STATE'S COUNTERCLAIMS

The state counterclaimed for removal of portions of the dike on the alternative theories that the dike encroached on state prop-

erty, obstructed a navigable channel and obstructed a watercourse. The state also sought restitution for converted gravel on the theory that it had been removed from state owned property.

### A.  Res Judicata

Pankratz first argues that the superior court should have found against the state on its counterclaims on the grounds of res judicata. Specifically, Pankratz argues that *Pankratz I* established (1) that the channel was not navigable and (2) that Pankratz had not blocked the channel with roads or dikes. In addition, he argues that the issue of whether the channel was a watercourse should have been raised in the first case.

*Pankratz I* made no explicit finding as to the navigability of the channel. The first case did hold that Pankratz was the owner of any land above the 418.5 mark and that the state was the owner of land below the 418.5 mark as it existed in 1973. The court did not articulate the basis for this holding. However, it is clear that a state has title to land underlying navigable waters up to the mean high water mark. *State Land Board v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977); *Alaska Pub. Easement Defense Fund v. Andrus,* 435 F.Supp. 664 (D.Alaska 1977). Thus, it is implicit in *Pankratz I* that the boundary determination was based on the channel being navigable. The superior court's finding in the present case that the upper portion of the channel was navigable is therefore consistent with *Pankratz I* and res judicata principles have not been violated.

Pankratz also argues that the *Pankratz I* holding that he had not blocked the channel should have prevented relitigation of the issue in the present case. This argument is of course correct to the extent that pre-*Pankratz I* activities are involved. However, Pankratz has presented no argument or citation to the record indicating

that the superior court received any evidence or otherwise considered or ruled on pre-*Pankratz I* activities. The state's counterclaims seek redress for post-*Pankratz I* activities, primarily construction of the dike. Thus, the issue of whether Pankratz blocked the channel after the *Pankratz I* decision was properly litigated in the present case.

■ Next, Pankratz argues that the issue of whether the channel was a watercourse should have been raised in the prior case and thus was barred by res judicata in the present case. The watercourse theory was not raised in *Pankratz I,* and hence was not decided. However, a mere change in the theory is not sufficient to prevent the application of the doctrine of res judicata:

> "Res judicata prevents the relitigation in a second suit for relief from judgment of matters which were adjudged *or could fairly have been adjudged* in a proceeding between the same parties raising the same claim for relief." (emphasis added, footnote omitted).

*Moran v. Poland,* 494 P.2d 814, 815 (Alaska 1972). The superior court in the present case misstated the doctrine, concluding that only issues that were actually decided in *Pankratz I* could have res judicata effect. The court's misunderstanding is harmless because here, again, the state's theory is that post-*Pankratz I* activities caused obstruction of the watercourse. Thus, the issue is not precluded by res judicata.

### B. Other Grounds

Pankratz argues that even if res judicata is not applicable, "[t]he evidence presented by the state did not under any theory propounded by the state support the findings for the state on its counterclaims." The basis of the court's holding in favor of the state is not entirely clear. At the conclusion of the trial, the judge referred to both the encroachment and the watercourse theories. In the written decision, prepared by the state, the court made a number of factual findings relating to encroachment and obstruction of a watercourse, but its conclusions of law seem to rest solely on the encroachment theory. Nevertheless, we hold that the superior court could have found in favor of the state on either of the theories.

■ The state's primary theory for removal of the dike was that it encroached on state property. The 1980 survey shows that portions of the dike were outside the boundary of Pankratz' property as established in *Pankratz I. See* Appendix. Thus, the dike would be on state property unless Pankratz could show that the land underlying the dike had accreted above the 418.5 mark since *Pankratz I.*[9] *See Honsinger v. State,* 642 P.2d 1352, 1354 (Alaska 1982). The state produced evidence showing that there had been no natural accretion, and the court agreed. We conclude that the superior court's finding that no natural accretion had occurred was not clearly erroneous. It follows that the court correctly concluded that the portions of the dike lying outside the 1973 418.5 mark encroached on state property and had to be removed.[10]

As an alternative, the state argued that the dike should be removed because it obstructed a watercourse. The parties agree

---

**9.** In *Pankratz I,* in applying federal law, we stated that "[i]t is well established that the burden of proving accretion rests with the party claiming the benefit thereof." 538 P.2d at 989, *citing Oklahoma v. Texas,* 260 U.S. 606, 638, 43 S.Ct. 221, 227, 67 L.Ed. 428 (1923). Alaska state law is in accord. *Schafer v. Schnabel,* 494 P.2d 802, 807 (Alaska 1972). Thus, the superior court correctly placed the burden of proof on Pankratz, even though the issue was raised in the state's counterclaim rather than in Pankratz' complaint.

**10.** Of course, the state was not automatically entitled to have the encroachment removed. We recently adopted the general rule that a landowner is entitled to injunctive relief unless the defendant can establish that (1) his conduct was in good faith and (2) the cost or practicability of removing the encroachment is wholly out of proportion to the extent of the encroachment. *Ostrem v. Alyeska Pipeline Service Co.,* 648 P.2d 986, 989, 990 (Alaska, 1982). Pankratz made no such showing in the present case.

with the law that one cannot obstruct a watercourse to the injury of another. *G & A Contractors, Inc. v. Alaska Greenhouses, Inc.,* 517 P.2d 1379, 1383–85 (Alaska 1974). Pankratz argues that (1) the channel is not a watercourse and (2) no damage to riparian owners was shown.

Although there is no uniform definition of "watercourse," the courts generally agree on three essential elements: (1) a definite stream of water, (2) flowing in a definite natural channel, and (3) originating from a definite source of supply. 1 W. Hutchins, Water Rights Laws in the Nineteen Western States, at 30 (1971). The great weight of authority is to the effect that the flow need not be continuous, but must be at least periodic. *Id.* at 32–33.

In *Weinberg v. Northern Alaska Development Corp.,* 384 P.2d 450 (Alaska 1963), we found that a slough which flowed only during the spring thaw and on infrequent occasions during heavy rains should be classified as a "drainway for surface waters" rather than a "watercourse". *Id.* at 451–52. *G & A Contractors, Inc. v. Alaska Greenhouses, Inc.,* 517 P.2d 1379 (Alaska 1974), involved Chester Creek, which naturally and continuously flowed across plaintiff's property. We stated that it was "clear beyond doubt" that the creek was a watercourse. *Id.* at 1384. The channel involved in the present case lies somewhere between these extremes—it is clearly not merely a drainway for surface waters, but it is also not a continuously flowing stream. There was evidence in both trials, including testimony by Pankratz, that water flowed in the channel at least once a year during high water times. In the trial of the present case, the state presented evidence that, prior to dike construction, the channel had a well-established path; that water had been observed in the channel subsequent to *Pankratz I;* and that the river strived to use the channel even with the dike in place. Thus, we think that all three of the essential elements were met.

Pankratz also argues that the state did not show damage to a riparian owner.[11] However, the state did produce evidence that since construction of the dike a downstream riparian's river bank had become obstructed by a silt deposit and the banks along the north bank of the river were experiencing greater erosion. Thus, the superior court could properly have concluded that there was damage to riparians.

We conclude that the state was entitled to have those portions of the dike that obstructed the flow of water in the channel removed under the watercourse theory.[12]

C. Conversion

The superior court found that 10,000 cubic yards of gravel had been removed and sold from the state-owned portion of the upper end of the channel. *See* Appendix. Pankratz was ordered to pay the state $3,500 for the conversion. Pankratz appears to argue that the state did not own the property. This is clearly wrong under *Pankratz I.* Pankratz does not seem to dispute that he removed and sold gravel from the upper channel. Thus, the court made no error as to the conversion issue.

The judgment of the superior court is AFFIRMED in all respects, subject to the limitation set forth in note 12 *supra.*

---

11. The superior court found that the state had standing as a riparian owner and on behalf of the other riparian owners to sue on the watercourse theory. Pankratz has not disputed this finding on appeal.

12. The superior court ordered removal of materials in the lower channel lying on Pankratz' property as established in *Pankratz I. See* Appendix. It is unclear whether the order was to restore the channel to its *Pankratz I* condition, or whether the order was to remove *all* materials, including those present before *Pankratz I.* The issue of whether the materials which were on Pankratz' property before *Pankratz I* blocked the channel should have been raised in the first case. Under the principle of res judicata, the superior court should have limited its order to restoration of the channel to the *Pankratz I* condition.

CHENA RIVER

HIGHWAY BRIDGE

1910 MEAN HIGH WATER LINE

PORTION OF DIKE TO BE REMOVED

GRAVEL CONVERSION AREA

1973 MEAN HIGH WATER LINE

PORTION OF DIKE TO BE REMOVED

PANKRATZ' MAINLAND PROPERTY

PORTION OF DIKE TO BE REMOVED

1980 GRAVEL PIT BOUNDARY

1980 VEGETATION LINE

LOWER CHANNEL MATERIAL TO BE REMOVED

APPENDIX